916 F.2d 714
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Terrence A. WILLIAMS, Defendant-Appellant.
 No. 89-4083.
 United States Court of Appeals, Sixth Circuit.
 Oct. 19, 1990.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Terrence Williams, was convicted of possession with intent to distribute cocaine base in violation of 21 U.S.C. Sec. 841(a)(1). Pursuant to the provisions of 21 U.S.C. Sec. 841(b)(1)(A), Williams was sentenced to 120 months imprisonment.
 
 
 2
 On appeal, Williams raises three issues: (1) lack of probable cause for his arrest and the resultant seizure of the incriminating cocaine base, (2) double jeopardy, and (3) a claim that 21 U.S.C. Sec. 841(b)(a)(A) is unconstitutional in that it denies equal protection of the laws to all citizens. Although we find all of these claims to be lacking in merit, we will discuss them individually. The conviction will be affirmed.
 
 I.
 
 3
 We deal first with the double jeopardy issue since it is easy of resolution. After the first day of trial, the government moved for a continuance because the chemist who was to testify for the government was seriously ill. The motion to continue was granted. Williams then moved for a mistrial and this motion was also granted. When Williams' second trial was scheduled, a claim of double jeopardy was made and rejected. Williams then appealed, but the second trial continued because the trial judge concluded the appeal was frivolous.[1] This decision was in keeping with the rule in this circuit that a trial court is not divested of jurisdiction when an appeal based on double jeopardy is filed unless the appeal has a "colorable foundation." United States v. Lanci, 669 F.2d 391, 394 (6th Cir.), cert. denied, 457 U.S. 1134 (1982). Here, the mistrial was at the request of the defendant and was requested as a matter of trial strategy. The mistrial motion was not triggered or necessitated by any misconduct on the part of the prosecution. United States v. Jorn, 400 U.S. 470, 485 (1971). We agree with Judge Dowd that the appeal was frivolous.
 
 II.
 
 4
 Defendant's argument that 21 U.S.C. Sec. 841(b)(1)(A) is unconstitutional is not a new one.[2] It has previously been considered and rejected by this court in United States v. Avant, 907 F.2d 623 (6th Cir.1990), and United States v. Levy, 904 F.2d 1026 (6th Cir.1990).[3]
 
 
 5
 Williams attempts to put a spin on the usual arguments made attacking the constitutionality of section 841(b)(1)(A) by arguing it is discriminatory as to poor blacks because they are more likely to possess and distribute crack cocaine than whites. There are three problems with this argument. First, it is raised for the first time on appeal and therefore is not properly before us. Boone Coal & Timber Co. v. Polan, 787 F.2d 1056 (6th Cir.1986). Second, as a result of being raised for the first time on appeal, defendant offers no empirical data to support the proposition that blacks are disproportionately impacted by section 841(b)(1)(A). Third, the mere fact that a criminal penalty provision can be shown to fall more heavily on one identifiable group as opposed to another does not, without more, implicate the equal protection provisions of the Constitution. As we pointed out in both Avant and Levy, Congress responded to the seriousness of the crack cocaine problem, as distinguished from other drug crime problems, by increasing the penalties for offenses involving crack cocaine. This was a legitimate exercise of legislative discretion and no argument is made that the legislation was aimed at blacks, the poor, or any other discrete group. We pass no judgment on whether some type of "disparate impact" argument might be constructed based upon a proper record since we have no record at all on this issue in this case.
 
 III.
 
 6
 In order to put defendant's "lack of probable cause for arrest" argument in proper perspective, it is necessary to limn the factual backdrop against which the legal arguments must be considered.
 
 
 7
 On April 17, 1989, two Cleveland detectives, working undercover, were surveilling the Cleveland Greyhound bus station. They were awaiting the arrival of a bus from Detroit, Michigan, a city considered to be a source city for narcotics coming into the Cleveland area. The defendant and another black male got off the bus with no luggage and were not met by friends or family. The two detectives decided to approach the two youths who began to walk away. The defendant and his companion became aware that they were being approached and broke into a run. The detectives yelled, "Stop. Police[,]" and gave chase. The person other than the defendant who was fleeing took a plastic bag out of his pocket, which appeared to contain crack cocaine, and tore it open with his teeth in an effort to dissipate the contents. The two suspects separated as they ran and only the defendant was overtaken. He was arrested and given his Miranda rights. In a search at the police station subsequent to arrest, he was found to be carrying 88.63 grams of cocaine base (crack). After the crack was found, defendant freely admitted he had come from Detroit to Cleveland to sell the crack and had done so before.
 
 
 8
 From these facts defendant argues that he was "seized" within the meaning of the fourth amendment without probable cause or even reasonable suspicion, that he was arrested without probable cause, and that since both his seizure and arrest were tainted, any subsequent evidence discovered or statements made must be suppressed.[4]
 
 
 9
 We have had occasion recently to address the nature of police-citizen contacts, such as are involved here. In United States v. Flowers, we stated:
 
 
 10
 [I]t is clear that there are three distinct types of contact that occur between police officers and the travelling public. The first is contact initiated by a police officer without any articulable reason whatsoever. This contact and its consequences are referenced in Florida v. Royer, 460 U.S. 491, 497 (1983), as follows:
 
 
 11
 [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See Dunaway v. New York, supra, at 210, n. 12; Terry v. Ohio, 392 U.S. at 31, 32-33 (Harlan, J., concurring); id. at 34 (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. United States v. Mendenhall, 446 U.S. 544, 555 (1980) (opinion of Stewart, J.).
 
 
 12
 See also United States v. Collis, 699 F.2d 832, 834-35 (6th Cir.), cert. denied, 462 U.S. 1119 (1983).
 
 
 13
 The second type of contact is that predicated upon "reasonable suspicion"--the classic Terry stop. The temporary detention of a person meeting the drug courier profile would be an example of this type of police-citizen contact which, although constituting a seizure, would not offend the fourth amendment.
 
 
 14
 The third type ... is when the officers have probable cause to believe a crime has been committed and that the person stopped committed it. In such situations the seizure may, in fact, be an arrest.
 
 
 15
 909 F.2d 145, 147 (6th Cir.1990) (footnote omitted). Consistent with the above analysis, the detectives described their standard operating procedure as follows:
 
 
 16
 THE WITNESS: It's enough to maybe go up and ask the male some questions. And that's what we do at times is go up and identify ourselves and tell them exactly what we're doing, investigating drug trafficking through the Greyhound and ask them if they mind answering questions.
 
 
 17
 If they say no, they go. And if they cooperate, they cooperate. (6-2-89 Suppression Hrng.Tr. at p. 41). The detectives never got an opportunity to complete a "first level" encounter, however, since the defendant and his companion fled. This interjects an element we did not have to consider in Flowers. Defendant argues that the command "stop," coupled with the chase, amounted to a seizure that was without probable cause or reasonable suspicion. We need not consider the probable cause or reasonable suspicion issue because we conclude that the command to stop the subsequent chase did not amount to a seizure implicating fourth amendment protections. The Supreme Court considered this issue very recently in Michigan v. Chesternut, 486 U.S. 567 (1988). Unfortunately, although on point, this decision left the waters still murky on this issue. Chesternut was an appeal from a Michigan Court of Appeals decision that had held that the federal Constitution mandates that all "investigatory pursuit" is a seizure. 157 Mich.App. at 183. The Supreme Court reversed and held that bright line rules were inappropriate and "that any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account "all the circumstances surrounding the incident" in each individual case. Chesternut, 486 U.S. at 572, quoting INS v. Delgado, 466 U.S. 210, 215 (1984), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.). Two other points must be made relative to Chesternut. Justice Kennedy filed a concurrence joined by Justice Scalia. Justice Kennedy stated:
 
 
 18
 We would do well to add that, barring the need to inquire about hot pursuit, which is not at issue here neither "chase" nor "investigative pursuit" need be included in the lexicon of the Fourth Amendment.
 
 
 19
 A Fourth Amendment seizure occurs when an individual remains in the control of law enforcement officials because he reasonably believes, on the basis of their conduct toward him, that he is not free to go. See, e.g., INS v. Delgado, 466 U.S. 210, 215 (1984); United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).
 
 
 20
 486 U.S. at 576-77. The Kennedy concurrence concluded with the following:
 
 
 21
 The case before us presented an opportunity to consider whether even an unmistakable show of authority can result in the seizure of a person who attempts to elude apprehension and who discloses contraband or other incriminating evidence before he is ultimately detained. It is at least plausible to say that whether or not the officers' conduct communicates to a person a reasonable belief that they intend to apprehend him, such conduct does not implicate Fourth Amendment protections until it achieves a restraining effect. The Court's opinion does not foreclose this holding, and I concur.
 
 
 22
 Id. at 577.
 
 
 23
 Justices Kennedy and Scalia clearly appear to be suggesting that a police chase does not result in a seizure until the suspect is caught. Although there is no specific reaction to this suggestion by the other members of the Court, we note that the principal opinion states in footnote 9:
 
 
 24
 The United States, which has submitted a brief as amicus curiae, suggests that, in some circumstances, police pursuit "will amount to a stop from the outset or from an early point in the chase, if the police command the person to halt and indicate that he is not free to go." Brief for United States as Amicus Curiae 13. Of course, such circumstances are not before us in this case. We therefore leave to another day the determination of the circumstances in which police pursuit could amount to a seizure under the Fourth Amendment.
 
 486 U.S. at 575-576 n. 9.[5]
 
 25
 Not unlike the Supreme Court in Chesternut, we elect to decide only the case before us. We conclude that under the circumstances here, if a seizure did occur during the pursuit stage of this encounter, it did not offend the fourth amendment. The police knew from past experience that Detroit was a source city and that drug couriers frequently travelled by bus between Detroit and Cleveland. They further knew that the couriers, more often than not, were young black males who arrived without luggage and were not met by anyone. This, coupled with the fact that the defendant and his companion were alert to surveillance and immediately fled when plainclothes officers approached,[6] provided sufficient reasonable suspicion to make a Terry stop.[7] Since a Terry stop allows for a temporary seizure of the person, we need not consider the implication of the command to stop and the subsequent pursuit.[8]
 
 
 26
 The problem here is that, upon catching up with the defendant, the officer did not complete a Terry stop but, rather, made an arrest which requires probable cause, not the more lenient reasonable suspicion predicate.
 
 
 27
 The district judge resolved the probable cause issue as follows:
 
 
 28
 The Court finds that the detectives had probable cause for the arrest of the defendant at the time he was apprehended at the intersection of Chester and 17th. The Court finds that probable cause existed for the arrest based upon the fact that Detective Zaller and his partner had observed the males fitting the Detroit to Cleveland drug courier profile, coupled with flight upon notice, and coupled with the undisputed fact that Detective Zaller witnessed the traveling companion attempting to destroy cocaine base crack--a commission of a crime in his presence.
 
 
 29
 (Dist.Ct.Order of June 13, 1989, at 10 (App. 29)). We have previously held that "[t]he district court's determination that probable cause existed to ... arrest ... must be accepted unless it is clearly erroneous." United States v. Pepple, 707 F.2d 261, 263 (6th Cir.1983) (citations omitted). Although we view the issue as a close one, we cannot say the conclusion of the district court was clearly erroneous. Since the arrest was proper, defendant's subsequent search and his incriminating admission after Miranda warnings were properly admissible.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 The appeal was subsequently dismissed due to lack of prosecution
 
 
 [2]
 The argument is predicated upon the fact that the mandated punishment for crimes involving cocaine base (crack) is considerably more severe than for crimes involving a comparable amount of cocaine powder
 
 
 [3]
 At least four other circuits have also rejected attacks on the constitutionality of 21 U.S.C. Sec. 841(b)(1)(A). See United States v. Buckner, 894 F.2d 975, 978-980 (8th Cir.1990); United States v. Colbert, 894 F.2d 373, 374-75 (D.C.Cir.1989), cert. denied, 110 S.Ct. 2601 (1990); United States v. Cyrus, 890 F.2d 1245, 1248 (D.C.Cir.1989); United States v. Malone, 886 F.2d 1162, 1166 (9th Cir.1989)
 
 
 [4]
 Defendant filed a timely suppression motion prior to trial which was denied
 
 
 [5]
 Brower v. Inyo, 489 U.S. 593 (1989), was decided subsequent to Chesternut. The opinion written by Justice Scalia, and concurred in by a majority of the Court, arguably has written another chapter on this question. Brower involved a police roadblock which not only stopped but also killed a fleeing stolen car driver. In the course of concluding that this stop was a fourth amendment seizure, the opinion quite clearly indicates that anything short of intentional acquisition of physical control is not a seizure. In fact, Justices Stevens, Brennan, Marshall, and Blackmun, although concurring in the result, write separately to disassociate themselves from this proposition which they label "dicta."
 
 
 [6]
 In United States v. Pope, 561 F.2d 663 (6th Cir.1977), we concluded that flight is an appropriate element to consider in the "reasonable suspicion" calculus
 
 
 [7]
 Terry v. Ohio, 392 U.S. 1 (1968)
 
 
 [8]
 We note in passing that, in Chesternut, Justice Kennedy said that "respondent's unprovoked flight gave the police ample cause to stop him." 486 U.S. at 576